AMERICAN CHINA DEVELOPMENT CO. v. BOYD.

(Circuit Court, N. D. California. August 11, 1906.)

No. 13,682.

1. PRINCIPAL AND AGENT—CONTRACT OF EMPLOYMENT—RATIFICATION.

The Chinese imperial government contracted with defendant for the construction and equipment of a railroad in China, and for the purpose of effecting the scheme a commission was organized, consisting of two Chinese and three Americans, to supervise the construction and operation of the line. The commission employed plaintiff, one of its number, for a period of five years, to act as secretary to the commission and to the general manager and engineer in chief, at a yearly salary. Plaintiff's employment was recognized by defendant's president in a letter, in which, however, he repudiated the commission's authority to make a five-year contract, but stated that his position would hold as long as that of his chief. Defendant also accepted plaintiff's services for a year and 10 months, paid his salary, and later directed his discharge before the expiration of the contract period, for the purpose of reducing expenses. *Held*, that defendant ratified plaintiff's contract, and was bound by its terms.

2. JUDGMENT—ESTOPPEL.

Where a contract of employment was broken by plaintiff's discharge during the month of June, 1904, a judgment recovered by plaintiff for his salary for that month did not estop him from thereafter suing defendant for damages for breach of contract.

[Ed. Note.—For cases in point, see vol. 30, Cent. Dig. Judgment, §§ 1092–1095, 1100.]

3. MASTER AND SERVANT—CONTRACT OF EMPLOYMENT — BREACH — PROSPECTIVE DAMAGES.

In an action by a servant for breach of a contract of employment caused by his discharge before the expiration of the term for which he was employed, he was entitled to recover prospective damages, consisting of the contract price unpaid, in the absence of proof by defendant that plaintiff might have obtained other employment.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 47, 54–56.]

John Garber, for appellant.

Bert Schlesinger and Marshall B. Woodruff (F. M. Brooks, of counsel), for appellee.

MORROW, Circuit Judge. This was an action brought by the plaintiff in the consular court of Shanghai, China, to recover from the defendant the sum of $21,000 for breach of contract. The cause of action stated in the petition is as follows:

"W. Porter Boyd, Plaintiff, vs. American China Development Co., Defendant.
Petition.

"Canton-Hankow Railway.

"To Honorable John Goodnow, Consul General, Acting Judicially: The petition of the above-named plaintiff shows:

"(1) That he is a citizen of the United States of America now residing at Shanghai, China, and within the jurisdiction of this honorable court.

"(2) That the defendant is a corporation organized and existing under and by virtue of the laws of the state of New Jersey, a sovereign state of the United States of America, doing business at said Shanghai, and within the jurisdiction of this honorable court.

"(3) That on the 21st day of August, 1902, at Shanghai, aforesaid, plaintiff and defendant mutually agreed by contract in writing, a copy of which contract is on file in the office of the U. S. consulate, to which reference is hereby made, that the plaintiff should serve the defendant, as set forth in said contract, and that the defendant should employ the plaintiff, for the term of five years, and pay him for his services $500 U. S. gold monthly, on the 5th of each month, during the term of said agreement.

"(4) That thereupon the plaintiff entered upon the service of the defendant under said agreement, and has ever since been, and still is, ready and willing to continue in such service.

"(5) That on the 11th day of July, 1904, the defendant wrongfully discharged the plaintiff, and refused to permit him to serve, as aforesaid, though the plaintiff then and there offered to continue in said service, and perform said agreement on his part, to the damage of the plaintiff in the sum of twenty-one thousand dollars.

"Wherefore the plaintiff demands judgment against defendant in the sum of $21,000 U. S. gold, and for costs of suit."

To this petition the defendant answered as follows:

"Between W. Porter Boyd, Plaintiff, and The American China Development Company, Defendant.

"Canton-Hankow Railway.

"The answer to the amended petition, filed on the thirty-first day of August, one thousand nine hundred and four, herein, sheweth as follows:

"(1) Paragraphs 1 and 2 of the petition herein are admitted, but the defendant company is not the Canton-Hankow Railway.

"(2) The defendant company denies that it entered into an agreement with the plaintiff, as alleged in the petition, or into any agreement with the plaintiff. The agreement referred to in paragraph 3 of the petition is made between the board of commission of the Canton-Hankow Railway. It is denied that the defendant company agreed to employ the plaintiff for the term of five years, or for any term, or to pay him for his services, or otherwise.

"(3) It is denied that the plaintiff entered into the service of the defendant company, or that the plaintiff has ever been in such service.

"(4) It is denied that the defendant company wrongfully discharged the plaintiff, as alleged in paragraph 5 of the petition. The plaintiff was discharged by the said board of commissioners on the thirtieth day of June, one thousand nine hundred and four, and has suffered no damage thereby.

"(5) In the alternative, if there was any agreement between the plaintiff and the defendant company or otherwise, which is denied, such agreement and employment were created by or subject to the terms of a letter dated the seventeenth day of March, one thousand nine hundred and three, written by the. president of the defendant company, and the contents of which letters were communicated to the plaintiff, and understood and agreed to by him. The following is a copy of such letter:

"'New York, March 17th, 1903.

" 'Mr. Willis E. Gray, Eng'r in Chief and General Manager, the American China Development Company, Shanghai, China— My Dear Sir: By a recent mail I wrote you in regard to Mr. Boyd, and the resolution of the board of commissioners giving him a five-year contract. Now the board of commissioners have no authority to do any such thing, and it is only fair to Mr. Boyd to state, in a manner not to be misunderstood, that the American China Development Company accepts no such terms by the board of commissioners. Mr. Boyd, who is secretary to the general manager, holds what is a confidential position, and his tenure of office can only be as long as that of his chief. Except for some extraordinary reason, you will not be interfered with in the selection of your private secretary, but you must give your successor the same privilege. I hope that Mr. Boyd will continue with the company five years, or as long as he may desire to stay, but such stay will be entirely independent of the recent resolution of the Board of ·Commissioners. Very truly yours,

" '[Signed]                              Wm. Barclay Parsons.'

"(6) Mr. Willis E. Gray was the engineer-in-chief and general manager of the defendant company at the date of such letter.

"(7) Mr. Gray was Mr. Boyd's 'chief,' within the meaning of the said letter.

"(8) Mr. Gray has since left China, and is not at present the engineer-in-chief and general manager of the defendant company, nor in that company's employment.

"(9) In the alternative, the plaintiff has sustained no damage, or the damages claimed by him are excessive.

"Wherefore, the defendant company prays: (1) For an order that the petition herein be dismissed. (2) For an order that the plaintiff do pay to the defendant company its costs of suit."

The agreement referred to in the third paragraph of plaintiff's petition, is as follows:

"Imperial Chinese Railway Administration, Canton-Hankow (Yueh Han) Line.

"Office of the Board of Commissioners.

"AGREEMENT.

"This agreement, made at Shanghai, China, on the 21st day of August, A. D. 1902 (one thousand nine hundred and two), between the board of commissioners of the Canton-Hankow (Yueh Han) Railway through its chairman, Willis E. Gray, hereinafter designated as the 'Commissioners,' and Mr. W. Porter Boyd, a citizen of the United States of America, residing at Honolulu, Hawaiian Islands, and to the date of the execution of this agreement holding a responsible position with the United States government, and hereinafter designated as the 'Secretary,' witnesseth:

"Article First. That the commissioners on behalf of the Canton-Hankow Railway employ the secretary for the period of five years, dated from the first day of August, 1902 (one thousand nine hundred and two), as secretary to the commissioners and secretary to the engineer in chief.

"Article Second. That the salary to be paid by the Canton-Hankow Railway to the secretary during the period of this agreement shall be annually six thousand gold dollars of the United States coinage of the present standard weight and fineness, the same to be paid in equal monthly installments on the fifth day of each month for the month last preceding.

"Article Third. That the commissioners pay the traveling expenses of the secretary and wife from Honolulu to Shanghai.

"Article Fourth. That the commissioners are to pay all proper and actual expenses incurred by the secretary for himself while the latter is absent from Shanghai on railway business, and the secretary shall pay his own personal expenses while on duty in Shanghai.

"Article Fifth. That the secretary shall faithfully and honestly to the best of his ability serve the commissioners and engineer in chief, and that his habits shall at all times be free from criticism, and shall not engage in any business without first obtaining the consent of the commissioners, nor divulge information concerning the affairs of the commissioners or the engineer in chief.

"Article Sixth. That should the secretary, at any time after the expiration of one year from date of this agreement, be unable to attend to his duties by reason of illness, continuing for three consecutive months, his salary shall be paid as usual, but if such illness continue beyond three months he shall receive no further salary until able to resume his duties, when his salary shall again be paid, beginning at the date of such resumption. If, however, the secretary does not enter upon his duties at the end of six months from the beginning of such sickness, then the commissioners may, if they so desire, declare this agreement terminated, and the secretary shall receive no further compensation.

"Article Seventh. That four copies of this agreement shall be made. A copy shall be filed with the director general and one in the consulate general of the United States at Shanghai. The commissioners and the secretary shall each retain a copy.

"In testimony whereof the commissioners have with the full approval of the director general of the Imperial Chinese Railway Administration, by and under the authority given them by article six (6) of the contract between the Imperial Chinese Government and the American China Development Company, dated April 14, 1898 (one thousand eight hundred and ninety eight), and July 13th, 1900 (one thousand nine hundred), and the secretary have upon the day and year first herein written signed their names and affixed their seals to the foregoing agreement.

"For the Canton-Hankow Railway, by order of the commissioners,

"[Signed]                  Willis E. Gray, Chairman. [Seal.]

"[Signed]                          W. Porter Boyd. [Seal.]

"Witness: [Signed] Geo. A. Derby."

The evidence shows that on the 21st day of August, 1902, the plaintiff entered into the service described in the agreement as secretary of the board of commissioners of the Canton-Hankow Railway and secretary to the engineer in chief; that he performed the services to which he was assigned, and was paid his salary, as provided in the agreement, by the American China Development Company from August 1, 1902, up to June 1, 1904, having served for a period of one year and 10 months; that he continued in the employment until July 11, 1904, when he was notified by the acting engineer in chief that, "having ceased to be secretary to the board of commissioners or to the engineer in chief," he was not to enter the office of the company in future. On July 11, 1904, the plaintiff brought suit in the consular court at Shanghai, China, for his services for the month of June, and recovered a judgment.

Upon the trial of the present case in the consular court a judgment was entered in favor of the plaintiff for $13,519. The case has been brought here both by appeal and by writ of error, under sections 4093 and 4096, Rev. St. U. S. [U. S. Comp. St. 1901, pp. 2771, 2772].

The appellant and plaintiff in error (the defendant in the consular

court) contends that the judgment in the consular court is erroneous in the following assigned particulars: (1) In adjudging that the defendant company was bound by the contract, or that it employed plaintiff in any capacity. (2) In adjudging that the plaintiff was not estopped from maintaining this action by his former suit for his salary for the month of June, 1904. (3) In adjudging that the plaintiff was entitled to prospective damages. (4) In considering the injury to plaintiff's character and the fees of his attorneys as elements of his damages. (5) The plaintiff testified on his own behalf. On cross-examination he was asked as to his duties as secretary of the board of commissioners, the apparent object of the question being to ascertain what proportion of plaintiff's work was done as secretary of the engineer in chief and what proportion as secretary to the board of commissioners. The consul overruled the question, and the action in not allowing the plaintiff to answer this question is assigned as error.

1. It appears from the record that on April 14, 1898, the Chinese minister at Washington, having been designated and deputed by the director general of Imperial Chinese Railways for the purpose, entered into a written contract with the American Chinese Development Company of New Jersey, wherein the latter agreed to provide a loan, amounting to £4,000,000 sterling, or its equivalent in American dollars gold, or more, if necessary, for the construction of a railway line in China from the city of Hankow to the city of Canton upon the security of Imperial Chinese gold bonds, carrying interest at the rate of 5 per cent. per annum, such bonds to be a first mortgage upon the railway and its appurtenances. The bonds were to be delivered to and taken by the American China Development Company at 90 per cent. of their face value, the company to have the liberty of selling any or all of the bonds to the public, the company bearing whatever loss and receiving whatever profit there might be in the sale. The company was also required by the contract to build and equip in accordance with the best modern system and operate a line of railway with all necessary appurtenances from Hankow to Canton and from Canton to the sea, if such latter extension should be deemed advisable, and as a remuneration for superintendence and services the company was to receive as compensation 5 per cent. on the entire cost of construction, excepting land and earthworks. After completion of the line, or so much of the line as might be in working order, it was to be operated under officials appointed by the company, who were to be approved by the director general. It was further agreed that, after paying salaries and wages and other expenses for operating and maintaining the line and the interest on the loan, the company should receive 20 per cent. on the net profits, to be represented by and in the form of debentures, to an amount equal to one-fifth of the cost of the line, which debentures should be issued in form agreed to by the director general and the company at the same time as the first mortgage bonds provided for in the agreement. By a supplemental agreement between the Imperial Chinese Railway Administration, under imperial sanction, and the American China Development Company, dated July 13, 1900, it was

recited that a preliminary survey, as provided in the main agreement, had been made, which had disclosed the fact that the work of construction would cost more than was contemplated, and that it was liberally estimated that a sum of $40,000,000 American gold would be required for building and equipping the railway. The American company was accordingly authorized to sell or hypothecate the bonds of such lines from time to time as money should be needed for the work, or as the money market would allow, and the provisions of the supplemental agreement were to be construed and treated as of the same purport and effect as a mortgage customarily executed and delivered in the United States to a trustee for the purpose of securing loans to and bond issues upon railway properties. In article 6 of this supplemental agreement, it was provided as follows:

"The director general shall * * * appoint a board for supervising the construction and operation of the railway, to be called the 'Board of Commissioners.' * * * The members thereof shall be five, of whom two are to be Chinese selected and appointed by the director general, and, besides the engineer in chief, there shall be two foreign members selected and appointed by the American company. The salaries of these five members are to be fixed by the director general and the American company, and to be paid from the general accounts of the railway."

In accordance with the foregoing paragraph of the supplemental agreement, a board of commissioners of the Canton-Hankow Railway was organized at Shanghai, China, on August 21, 1902. The members of the board present were W. E. Gray, Chun Oiting, J. S. Fearon, and W. P. Boyd, plaintiff in this case. The object of the meeting, as stated by the chairman, was the organization of the board of commissioners of the Canton-Hankow Railway under the contract. In the minutes of the proceedings of the board on this occasion it is recited:

"Notice was given by his excellency Sheng Tajen that Mr. Chun Oiting and Taotai Wong Kai Kah were appointed as members of the board of commissioners for the Chinese. The American China Development Company advised that Mr. J. S. Fearon and Mr. W. P. Boyd, with Mr. W. E. Gray, engineer in chief, were the commissioners to represent its interests on the board of commissioners. * * * It was moved by Mr. Chun Oiting and seconded by Mr. Fearon that the chairman be authorized to employ Mr. W. P. Boyd as secretary to the board of commissioners and also to the engineer in chief at a salary of six thousand dollars ($6,000) U. S. gold per annum, and to execute a contract with him, which contract was submitted, covering a period of five years from August 1, 1902. Resolution and contract were approved, and contract duly executed."

The contract has already been set out on 148 Fed. 260. On January 10, 1903, William Barclay Parsons, president of the American China Development Company, gave to Kenneth J. Kingsford in New York City a letter of introduction to W. E. Gray, general manager and engineer in chief at Shanghai, China, informing the latter that Kingsford had been appointed controller of the American China Development Company. The letter contained the following paragraph:

"As Mr. Kingsford is the head of a department, and ranking next to you in China, it will be well to have him replace Mr. Boyd on the board of commissioners, so that any financial matters that may arise at the meetings of the

board may be promptly and properly answered by the comptroller. It is not necessary to displace Mr. Boyd as secretary of the board of commissioners, as that is a position which I think he should continue to fill, and there is no reason why a member of the board should be secretary of it."

On March 17, 1903, Mr. Parsons, as president of the company, wrote to W. E. Gray, as general manager and engineer in chief, concerning the contract entered into between the board of commissioners and W. P. Boyd August 21, 1902, employing the latter for a term of five years. This letter is as follows:

"By a recent mail I wrote you in regard to Mr. Boyd, and the resolution of the board of commissioners giving him a five-year contract. Now the board of commissioners have no authority to do any such thing, and it is only fair to Mr. Boyd to state, in a manner not to be misunderstood, that the American China Development Company accepts no such terms by the board of commissioners. Mr. Boyd, who is secretary to the general manager, holds what is a confidential position, and his tenure of office can only be as long as that of his chief. Except for some extraordinary reason, you will not be interfered with in the selection of your private secretary, but you must give your successor the same privileges. I hope that Mr. Boyd will continue with the company five years, or as long as he may desire to stay, but such stay will be entirely independent of the recent resolution of the board of commissioners."

Mr. Gray showed this letter to Mr. Boyd, who testified that he told Mr. Gray that the American China Development Company was rather late in the day; that he had already resigned a government position and signed the contract with the company. Mr. Gray said that it wouldn't make any difference, that the board had a perfect right to make the contract, and that he would write a letter to that effect. Mr. Gray accordingly wrote to the New York office under date of May 9, 1903, as follows:

"I have shown your letter in relation to Mr. Boyd to him. I am quite sure the board of commissioners felt they were acting fully within their authority when they made a contract with him."

Mr. Boyd continued to perform the duties mentioned in the contract, and was paid his regular monthly salary until May 2, 1904, when the board of commissioners received a telegram from the New York office, dated May 1, 1904, as follows:

"Immediately on receipt of this limit expenditure to $45,000 monthly including everything. Construction-lan-police-general expenses, discharge Boyd, buy wood ties Yuehhan."

In presenting this telegram to the board of commissioners Mr. Kingsford said:

"Owing, I believe, to some reason or other, the expenses here are to be curtailed, and Mr. Boyd discharged, I presume, in consequence. I have instructed Mr. Boyd that his services as an officer of the American China Development Company have ceased, and he will therefore cease to represent the American China Development Company as an acting commissioner on this board."

On the 6th of June, 1904, Mr. Kingsford, acting agent and comptroller of the defendant, wrote to the plaintiff, referring to the notice which he gave the plaintiff on the 1st of May, stating that he had received telegraphic instructions from New York to discharge the

plaintiff, and that he wrote the letter to inform him that he now had another cable from the New York office stating that they considered the plaintiff discharged since April 30th. Mr. Kingsford further says in this letter:

"As we have paid you your salary up to the first of June, this company cannot give you any further remuneration. We are, however, prepared to pay your passage back to Honolulu, as is customary, should you wish it. Kindly give the writer all the keys belonging to the company, and correspondence and documents which you have in your office."

To this letter the plaintiff replied on June 7th as follows:

"The instructions received by you from the New York office prompting the announcement conveyed in your letter of the 6th inst., whereby a solemn contract between the American China Development Company and myself is declared abrogated, is clearly in violation of the rights and privileges guaranteed and secured to me by the terms of said contract, made in strict compliance and conformity with the clear and well-defined powers with which the board of commissioners is endowed, which is clearly stated in article No. 6 of the rules defining the power of the board of commissioners. I will therefore refuse to consider myself discharged or deprived of any of my legal rights under the terms of said contract, and I will not deliver up the keys, correspondence, and documents in my custody belonging to the company, in compliance with the demand in your letter of the 6th inst., and will continue to perform my functional duties as though no such order of discharge had been made."

On June 30, 1904, the board of commissioners adopted the following resolution:

"Resolved that Mr. W. P. Boyd is hereby discharged from his position as secretary to this board and to the engineer in chief, and is hereby notified to turn over all records of said offices to the board of commissioners and the acting engineer in chief, respectively."

It appears from this evidence that the Imperial Chinese government entered into an agreement with the American China Development Company for the construction and equipment of a line of railway from Hankow to Canton. The Chinese government was to issue bonds to the amount of $40,000,000, which were to be taken and sold by the American China Development Company, and with the proceeds the company was to build, equip, and operate the road in accordance with the terms of the agreement. For the purpose of carrying this scheme into operation, a board for supervising the construction and operation of the railway was provided. This board was to be called the "Board of Commissioners." It was to consist of five members. Two of the members were to be Chinese, who were to be selected and appointed by the director general of the Imperial Chinese Railway Administration. There were to be two foreign members besides the engineer in chief, who were to be selected and appointed by the American China Development Company. The salaries of these five members were to be fixed by the director general and the American China Development Company, and were to be paid from the general accounts of the railway. The board of commissioners, as a body, was, in effect, the agent of both the Chinese government and the American China Development Company in the construction and equipment of a line of railway from Hankow to Canton, and the members of the

board individually were appointed by, and represented the interests of, their respective principals. The plaintiff became a member of the board at the time of its organization, representing the interests of the American China Development Company. This is set forth in the proceedings of August 21, 1902, connected with the organization of the board, under paragraph 6 of the supplemental agreement. It is stated in the minutes of the proceedings that the American China Development Company advised that Fearon, Boyd, and Gray were the commissioners to represent its interests on the board. In addition to being a member of the board of commissioners, the plaintiff was employed by the commissioners on behalf of the Canton-Hankow Railway for the period of five years, dating from the 1st day of August, 1902, as secretary to the commissioners and secretary to the engineer in chief. This employment was manifestly in the interest of the American China Development Company, and was made by the commissioners as the agent of that company. It is true the name of the company was not mentioned as the contracting party in the agreement of August 21, 1902. The parties to that agreement were the "Board of Commissioners of the Canton-Hankow (Yueh Han) Railway, through its Chairman, Willis E. Gray, * * * and Mr. W. Porter Boyd." The agreement, however, recites that it is "with the full approval of the director general of the Imperial Chinese Railway Administration, by and with the authority given them article six (6) of the contract between the Imperial Chinese government and the American China Development Company, dated April 14, 1898, and July 13, 1900."

The employment of the plaintiff was recognized and ratified by the president of the American China Development Company in his letter of January 10, 1903, to Willis E. Gray, general manager and engineer in chief, in which he says that it would be well for Mr. Kingsford to replace Mr. Boyd on the board of commissioners, but he also says that it will not be necessary for him to replace Mr. Boyd as secretary of the board of commissioners. The employment was also recognized by the president of the company in his letter of March 17, 1903, when he undertook to repudiate the contract providing for the employment of the plaintiff for a period of five years, and said that the board of commissioners had no authority to do any such thing. The objection to the contract was, however, stated to be that the secretary to the general manager holds what is a confidential position, and his tenure can only be as long as his chief. The president hoped that Mr. Boyd would continue with the company five years, or as long as he might desire to stay. The employment was also recognized and ratified by the company in accepting his services for a period of one year and 10 months, and paying his salary during that time, upon printed vouchers made out in form against the company. The company also recognized his employment in directing his discharge from the employment of the company on May 1, 1904, June 6, 1904, and June 30, 1904.

There can be no question, therefore, but that the plaintiff was employed by the defendant during the time plaintiff continued in such

employment. He certainly was not employed by the Chinese government nor by the board of commissioners except as the agent of the American China Development Company. But, was the defendant bound by the agreement of August 21, 1902, to the employment of the plaintiff for the period of five years? That is the question.

The plaintiff was in the service of the United States government as shipping commissioner at Honolulu when he went to Shanghai and signed the agreement of August 21, 1902. After that contract was signed, and not before, he resigned his position as shipping commissioner. It will not be presumed that the plaintiff would be employed in such important positions, as that mentioned in the contract, or trusted with such confidential relations to defendant's business and operations, without some one responsible for his engagement having knowledge of his ability, experience, and previous occupations. The agreement provided that he should be employed as secretary to the commissioners and secretary to the engineer in chief. He at once entered upon and performed the duties of these two positions. The agreement provided that he should be paid an annual salary of $6,000 in gold, to be paid in monthly installments. This salary was paid to him by the defendant for the period of one year and 10 months. The services performed and salary paid were certainly under the written contract, as there was no other, and if the contract was not originally authorized by the defendant, these acts certainly constituted ratification. But the defendant claims to have repudiated the contract in March, 1903, more than six months after its execution, on the ground that one of the positions held by the plaintiff under the contract was a confidential one to another officer, and that his employment could only continue as long as it was agreeable to that officer. The plaintiff protested against this interpretation of the contract, and refused to accept it. Nevertheless, he was continued in the employment without further controversy for more than a year longer, performing the duties prescribed in the contract. He was then ordered discharged, not because the plaintiff had failed to perform his duties, or in any respect lacked qualifications for them, and not because his employment in a confidential position to another officer was not agreeable to that officer or to the commissioners, but the discharge was ordered because the company desired to reduce expenses. Manifestly, this was not a denial of the obligations of the contract. Moreover, there is not a particle of evidence in the record tending to show that the plaintiff either entered into the employment of the defendant, or continued in such employment with any agreement or understanding that the tenure of his employment was dependent upon the expenses attending defendant's operation. My conclusion is, therefore, that the defendant is bound by the contract as a principal, the contract having been executed by the board of commissioners as the agent of the defendant; but, if there is any question as to the authority of the board of commissioners to make this contract, it was afterward ratified by the acts of the defendant.

2. There is nothing in the record to sustain the claim of the defendant that the plaintiff is estopped from maintaining this action by

his former suit for his salary for the month of June, 1904. The suit is not pleaded, and there is no judgment in the record, but in the defendant's answer it is alleged that the plaintiff was discharged by said board of commissioners on the 30th day of June, 1904, and had suffered no damage thereby. In the report of the testimony taken upon the trial in this case on September 8, 1904, there is the following statement, referred to in the bill of exceptions:

"By agreement between the two counsel, the evidence of Messrs. Boyd and K. J. Kingsford, as given in this court on the 22d of July, was admitted as testimony in this case, and the exhibits of the suit heard on the 22d of July were agreed upon as exhibits in this case."

In the testimony of the plaintiff, Boyd, given in the prior case, and by the agreement made evidence in this case, is the following:

"Q. Did you make a demand for the payment of your salary for the month of June, and it was refused? A. I did, on the 5th June, and it was refused. Q. How much was due you? A. $500 gold."

In the opinion of the consular court there is this reference to this prior case:

"On July 11th Mr. Boyd brought suit for services rendered in June, 1904, under the before mentioned contract, and obtained judgment therefor in this court. In the present suit Boyd sued on August 10th for U. S. gold $500 for July salary. Defendant denied any agreement, and maintained that plaintiff's proper remedy, if any, was to sue for damages for breach of contract. Plaintiff on September 1st filed a new petition, alleging breach of contract, and asking U. S. gold $21,000 damages. To this procedure defendant offered no objection."

If this reference to the prior suit in the opinion of the court and in the bill of exceptions be deemed sufficient to require this court to consider this specification in the appeal, it is sufficient to say that the former suit appears to have been for the salary of the plaintiff for services rendered during the month of June, 1904, under the contract of August 21, 1902. The present suit is for breach of that contract in July, 1904. There is no estoppel in the prior suit prosecuted by the plaintiff for his salary for services rendered under a contract as against the present suit brought for a subsequent breach of that contract.

3. The present suit appears to have been originally brought by the plaintiff to recover from the defendant the salary due plaintiff for his services during the month of July, 1904. The defendant denied liability upon such a cause of action, and maintained that plaintiff's remedy, if any, was for damages for breach of contract. The plaintiff accordingly amended his petition, claiming damages for a breach of contract. To this amended petition no objection was made, and no objection was offered to the testimony introduced in support of the amended petition. Plaintiff testified in his own behalf upon the hearing as follows:

"Mr. Brooks. How many months remain unexpired of the term of your contract? Witness. Three years and one month. Mr. Brooks. That is including July and August? Witness. Yes. Mr. Brooks. You say that is three years? Witness. Thirty-seven months. Mr. Brooks. At $500 gold a month, if you were permitted to carry out the contract? Witness. That is $18,500 gold.

\* \* \* Mr. Brooks. Have you endeavored to find any employment during the last month or two? Witness. I made inquiries among my friends during the last month or two, and I have been unable to find any employment so far. There is no good outlook for me for a position."

Without objection or exception to this testimony, no question would be presented to this court for review upon writ of error, and, while the case comes here on appeal, the statute makes the appeal subject to the rules, regulations, and restrictions prescribed in law for writs of error from district courts to circuit courts. Rev. St. § 4093 [U. S. Comp. St. 1901, p. 2771].

But the appellant seeks to avoid the absence of objections and exceptions to the testimony by urging the objection that the judgment was excessive, and made excessive by the consular court, taking into consideration the prospective damages which the plaintiff would suffer between the date of trial and the expiration of the contract. The amount sued for was $21,500. The plaintiff had recovered a judgment for his salary for the month of June, 1904. The trial was had on September 10, 1904. There was then due the plaintiff under the contract his salary for two months and 10 days, or $1,166. If the plaintiff had been permitted to continue to discharge his duties under the contract until the expiration of the term, his salary for the unexpired term would have amounted to $18,500. The judgment was for $13,519. It is evident that the court, in entering its judgment for the plaintiff, did take into consideration prospective damages. Was the judgment excessive by reason of that fact? Assuming, without admitting, that this question is open for consideration on this appeal, I think the law as now established by the authorities, upholds the judgment.

In Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, the action was for breach of four certain contracts for the delivery of certain bales of hops. As to the first contract, the term to commence performance had arrived, and a shipment had been tendered and refused. The breach as to the other three contracts was the refusal to perform before the time for performance had arrived. The court, in deciding the case, reviewed the American and English cases relating to the right of the injured party to recover prospective damages for the breach of an executory contract. The court held that the doctrine that there might be an anticipatory breach of an executory contract by an absolute refusal to perform it had become the settled law of England as applied to contracts for services, for marriage, and for the manufacture and sale of goods, and that the rule laid down in Hochster v. De la Tour, 2 El. & Bl. 678, was a reasonable and proper rule to be applied to the case before the court. That case was an action to recover prospective damages for the breach of a contract for employment, and its approval by the Supreme Court of the United States makes it applicable to the present case. The case is stated by the Supreme Court as follows:

"Plaintiff, in April, 1852, had agreed to serve defendant, and defendant had undertaken to employ plaintiff, as courier, for three months from June first, on certain terms. On the eleventh of May defendant wrote plaintiff that he had changed his mind, and declined to avail himself of plain-

tiff's services. Thereupon, and on May twenty-second. plaintiff brought an action at law for breach of contract, in that defendant, before the said first of June, though plaintiff was always ready and willing to perform, refused to engage plaintiff or perform his promise. and then wrongfully exonerated plaintiff from the performance of the agreement, to his damage; and it was ruled that, as there could be a breach of contract before the time fixed for performance, a positive and absolute refusal to carry out the contract prior to the date of actual default amounted to such a breach. In the course of the argument, Mr. Justice Crompton observed: 'When a party announces his intention not to fulfill the contract, the other side may take him at his word, and rescind the contract. The word "rescind" implies that both parties have agreed that the contract shall be at an end as if it had never been. But I am inclined to think that the party may also say: "Since you have announced that you will not go on with the contract, I will consent that it shall be at an end from this time; but I will hold you liable for the damage I have sustained. and I will proceed to make that damage as little as possible by making the best use I can of my liberty." ' "

In delivering the opinion of the court (Campbell, C. J., Coleridge, Erle, and Crompton, JJ.), Lord Campbell, after pointing out that at common law there were numerous cases in which an anticipatory act, such as an act rendering the contract impossible of performance, or disabling the party from performing it, would constitute a breach giving an immediate right of action, laid it down that a positive and unqualified refusal by one party to carry out the contract should be treated as belonging to the same category as such anticipatory acts, and said (page 690):

"But it is surely much more rational, and more for the benefit of both parties, that, after the renunciation of the agreement by the defendant, the plaintiff should be at liberty to consider himself absolved from any future performance of it, retaining his right to sue for any damage he has suffered from the breach of it. Thus, instead of remaining idle and laying out money in preparations which must be useless, he is at liberty to seek service under another employer, which would go in mitigation of the damages to which he would otherwise be entitled for a breach of the contract. It seems strange that the defendant, after renouncing the contract. and absolutely declaring that he will never act under it, should be permitted to object that faith is given to his assertion, and that an opportunity is not left to him of changing his mind. If the plaintiff is barred of any remedy by entering into an engagement inconsistent with starting as a courier with the defendant on the 1st of June, he is prejudiced by putting faith in the defendant's assertion; and it would be more consonant with principle if the defendant were precluded from saying that he had not broken the contract when he declared that he entirely renounced it. Suppose that the defendant, at the time of his renunciation, had embarked on a voyage for Australia, so as to render it physically impossible for him to employ the plaintiff as a courier on the continent of Europe in the months of June, July, and August. 1852. According to decided cases, the action might have been brought before the 1st of June; but the renunciation may have been founded on other facts, to be given in evidence, which would equally have rendered the defendant's performance of the contract impossible. The man who wrongfully renounces a contract into which he has deliberately entered cannot justly complain if he is immediately sued for compensation in damages by the man whom he has injured; and it seems reasonable to allow an option to the injured party, either to sue immediately, or to wait till the time when the act was to be done, still holding it as prospectively binding for the exercise of this option, which may be advantageous to the innocent party, and cannot be prejudicial to the wrongdoer. An argument against the action before the 1st of June is urged

from the difficulty of calculating the damages, but this argument is equally strong against an action before the 1st of September, when the three months would expire. In either case, the jury in assessing the damages would be justified in looking to all that had happened, or was likely to happen, to increase or mitigate the loss of the plaintiff down to the day of trial. We do not find any decision contrary to the view we are taking of this case."

In a previous case (Pierce v. Tennessee Coal, etc., R. R. Co., 173 U. S. 1, 19 Sup. Ct. 335, 43 L. Ed. 591) the Supreme Court of the United States had held that on discharge from a contract of employment the party discharged might elect to treat the contract as absolutely and finally broken, and in an action to recover the full value of the contract to him at the time of the breach include all that he would receive in the future as well as in the past, deducting any sum that he might have earned or that he might thereafter earn. Mr. Justice Gray, speaking for the court, said:

"It appears to us to be equally clear that the Circuit Court of the United States erred in excluding the evidence offered by the plaintiff, in restricting his damages to the wages due and unpaid at the time of the trial, and in declining to instruct the jury as he requested. Upon this point the authorities are somewhat conflicting, and there is little to be found in the decisions of this court, having any bearing upon it, beyond the affirmance of the general propositions that 'in an action for a personal injury the plaintiff is entitled to recover compensation, so far as it is susceptible of an estimate in money, for the loss and damage caused to him by the defendant's negligence, including not only expenses incurred for medical attendance and a reasonable sum for his pain and suffering, but also a fair recompense for the loss of what he would otherwise have earned in his trade or profession, and has been deprived of the capacity of earning by the wrongful act of the defendant'; and, 'in order to assist the jury in making such an estimate, standard life and annuity tables, showing at any age the probable duration of life, and the present value of a life annuity are competent evidence' (Vicksburg, etc., Railroad v. Putnam, 118 U. S. 545, 554, 7 Sup. Ct. 1, 30 L. Ed. 257) ; and that in an action for breach of contract 'the amount which would have been received if the contract had been kept is the measure of damages if the contract is broken' (Benjamin v. Hillard, 23 How. [U. S.] 149, 167, 16 L. Ed. 518). But the recent tendency of judicial decisions in this country, in actions of contract, as well as in actions of tort, has been towards allowing entire damages to be recovered, once for all, in a single action, and thus avoiding the embarrassment and annoyance of repeated litigation. This especially appears by well-considered opinions in cases of agreements to furnish support or to pay wages, a few only of which need be referred to."

In the case of Rhoades v. Chesapeake & O. Ry. Co., 49 W. Va. 500, 39 S. E. 209, 55 L. R. A. 170, 87 Am. St. Rep. 826, the same doctrine was declared by the Supreme Court of West Virginia with respect to a similar state of facts.

The appellant contends that the law of the last two cases is not applicable to the present case, for the reason that in both cases the employés had received permanent injuries in the service of the employers, and as compensation for such injuries the employers had entered into agreements with the employés to pay them wages and provide them with support. In such cases it is contended that the damages can be determined with some degree of certainty, presumably for the reason that it was not probable that they could obtain employment elsewhere, and the cost of support could be ascertained, while in the present case it is said the plaintiff's damages will be un-

certain, since he might obtain employment elsewhere, and even more remunerative than that from which he was discharged, and his support is not involved. But this is a question of evidence relating to the mitigation of damages, and—

"The burden of proof is on the defendant to show that the plaintiff might have obtained other employment; for the failure of the plaintiff to obtain other employment does not affect the right of action, but only goes in reduction of damages, and, if nothing else is shown, the plaintiff is entitled to recover the contract price upon proving the defendant's violation of the contract and his own willingness to perform." Sedgwick on Damages, par. 667, and cases there cited.

4. It was not alleged in the petition that plaintiff had incurred any expense in employing an attorney to prosecute the action, nor was it alleged that he had suffered any damage to his character by reason of the discharge. The testimony relating to these matters was introduced without objection or exception, and, as there is no evidence that the court considered either as elements of damages, they will not be deemed to have entered into the judgment.

5. The question asked the plaintiff on cross-examination as to his duties as secretary to the board of commissioners was so manifestly intended to call for irrelevant and immaterial testimony that the discussion of this specification appears to be unnecessary.

It follows from what has been said with respect to the several specifications set forth in the appeal that no error appears on the record, and the judgment of the lower court is therefore affirmed, with costs and interest.