# WHEELING.

RHOADES *v.* CHESAPEAKE AND OHIO RAILWAY CO.

Decided June 13, 1901.

1. PERMANENT INJURY—*Release of Damages—Contract.*

If a person having received permanent injury in the service of his employer, and claiming the injury was caused by the negligence of the latter, in consideration of an agreement on the part of the employer to give him work so long as he gives satisfaction to the foreman or superintendent under whom he works, releases his claim for damages for said injury, and is then given employment in pursuance of the agreement at wages agreed upon between them, there is no lack of certainty or mutuality in the agreement, for all its terms are settled and, by releasing his claim for damages, the employe has paid in advance for the option to do such work for his employer as he is able to do, and he cannot be discharged without cause. (p. 497).

2. SERVANTS DISCHARGE—*Action—Recovery.*

If, in such case, the servant be discharged without cause, he may treat the contract as absolutely broken by the master, and, in an action thereon, recover the full value of the contract to him at the time of the breach, including all that he would have received in the future as well as in the past if the contract had been kept, less any sum he might have earned already or might thereafter earn in other service, as well as the amount of any loss the defendant sustained by the loss of his services without the master's fault. (p. 498).

3. DISCHARGE—*Cause—Burden of Proof—Trial.*

In the trial of such case, the burden is upon the defendant to show that the discharge was for good cause, and a verdict for the plaintiff should not be set aside unless it is clearly wrong. (p. 499).

4. AGREEMENTS IN WRITING—*Same Subject.*

If two writings of different dates, made between the same parties and relating to the same subject matter, are not different from each other in legal effect, though different in terms, and the later in date is, among other things, a receipt for a sum of money, mentioned in the other and to be paid, and, therefore, a voucher, passed between the parties in performance of the first agreement, such first agreement is not discharged by the execution of the latter, and resort may be had to both instruments in ascertaining the rights and liabilities of the parties. (p. 500).

5. INSTRUCTION—*Theory—Facts Tending to Prove.*

> An instruction, stating the law applicable to one theory of
> the case, and substantially covering all the facts upon which the
> correctness of such theory depends, is proper, if there is any evi-
> dence in the case, tending to prove such facts, although it
> ignores other facts put in issue as part of another and different
> theory which, if true, leads to a different conclusion and result,
> when another instruction has been given in the case, covering
> such conflicting theory. (p. 505).

Appeal from Circuit Court, Kanawha County.

Action by G. W. Rhoades against the Chesapeake & Ohio Rail-
way Company. Judgment for plaintiff. Defendant brings
error.

*Affirmed.*

SIMMS & ENSLOW, for plaintiff in error.

E. W. WILSON, for defendant in error.

POFFENBARGER, JUDGE:

On or about November 7, 1896, G. W. Rhoades, then em-
ployed as a section hand by the Chesapeake and Ohio Railway
Company, received an injury, while assisting in replacing on
the track a derailed freight car on the Cabin Creek branch of
said railroad, which necessitated the amputation of one of his
legs, on the 27th day of December, following. Soon after he
was discharged from the hospital, negotiations for a settlement
with him were commenced by the claim agent of the railway
company, which resulted in the preparation by said agent, and
signing by Rhoades, of the following instrument:

"COALBURG, W. Va., April 27, 1897.

I hereby agree to accept six hundred dollars in full settle-
ment, satisfaction and discharge of all claims arising from or
growing out of personal injuries, received by me on or about
Nov. 7, 1896, while working as a laborer at wreck at Dry Branch
on Cabin Creek, in the service of C. & O. Ry, said amount to be
paid without delay by voucher through agent at Charleston, W.
Va. In addition I am to be given a job as watchman or in other
service which I can perform. It being understood that I stand
in same relation to the company as any other employe injured or
not injured and will be removed only for cause and will have a

steady job so long as I give satisfaction to the foreman or superintendent under whom I work.

    [Signed.]                           G. W. RHOADES."

It was left in the possession of Rhoades, and the agent said he would talk with the superintendent upon his return to Huntington and if he agreed to the terms of the proposed settlement, a voucher would be sent to Charleston and the amount paid. He found the adjustment satisfactory to the superintendent, who directed him to prepare a voucher for the amount. Not having a copy of the writing upon which he and Rhoades had agreed, and wishing to embody its terms in the voucher, the agent relied upon his memory in the preparation of the voucher, which he claims Rhoades signed, May 1, 1897, and which is as follows:

"Chesapeake & Ohio Railway Company, 139634. Claim No. 2997.

To George W. Rhoades, Dr.

1897,                                  Address, Charleston, W. Va.

April 26th. For amount agreed upon in full settlement, satisfaction and discharge of all claims or cause of action arising from or growing out of personal injuries received by me on or about Nov. 7, 1896, while on duty as laborer at Dry Branch at Drainment of train 113 on Cabin Creek branch, . . . . $600.00

    O. K.

| Charge to | Amount | Certified | Approved |
|-----------|--------|-----------|----------|
| Hun. Div. | $600.00 | J. W. Winget, | |
| C. T. 52 | | Claim Agent. | |

Received, Charleston, W. Va., May 1st, 1897, of the Chesapeake and Ohio Railway Company the sum of six hundred dollars in full compromise, satisfaction and discharge of all my claims or causes of action and particularly of all claims or causes of action arising out of the personal injuries received by me, Nov. 7, 1896, as per above voucher in addition to this I am to be given an opportunity to work for the company under like conditions and circumstances as any other employe injured or not injured so long as I give satisfaction to the foreman or superintendent under whom I work.

GEORGE W. RHOADES. [Seal.]

J. W. Winget:
L. H. Moseman: Witnesses.

The six hundred dollars was paid at the Charleston office of the company on or about May 1, 1897, and on that occasion Win-

get, the claim agent, called upon Rhoades for a copy of the writing of April 27, 1897. It being produced and a copy taken on the company's letter press, the agent took said copy with him. It was attached to and returned with the other papers. Rhoades swears he never signed the voucher of May 1st, but Winget and Moseman, the subscribing witnesses, testify that he did.

On June 1, 1897, Rhoades went to work for the company in pursuance of their agreement, and, for about nine months thereafter, was kept busy at tamping ties, grassing the track, tightening bolts and watching at a cut near the town of Milton. Then the company not requiring a watchman at said cut any longer, he was sent to Hinton to tend the switches in the yard. He refused to do this work on the ground that he could not perform it, owing to the distance between the switches being so great that he could not travel it in the limited time permitted. He was then brought back to Milton, where he worked awhile longer, grassing the track and tightening bolts. In the month of July, 1898, he was discharged. He claims he was unable to do the work required of him at that time. As to the character of this work, Clifford, the foreman, says "Spencer (supervisor of track) told me and I told him (Rhoades) that he would have to tighten up bolts and raise low joints, for me to give him a beat. I gave him about a mile and a half of bolts to tighten up and about a quarter of a mile of grassing to do. Well, he done that piece of grassing all right and worked some at the bolts, and I asked him to go to the east end—the east end of the section—and he refused." That was about three miles from where he had been working. Clifford further describes the work as follows: "It is putting in bolts, tightening up bolts, and where ties are churning at the ends, picking away from the end and letting the water out, throwing up gravel, grassing and such work as a watchman generally does."

Spencer's statement, relating to the dismissal of Rhoades, is as follows: "There was a few joints in the cut near where Mr. Rhoades lives—I don't suppose they were farther from his door than from here across the street. I wanted him to go there and help the watchman take them up, because I didn't want to take a gang over there. Well, the foreman came to me, and told me that he said he wouldn't do it. Mr. Rhoades met me the next morning at Milton, and says to me, 'What is it that you want me to do?' I says 'Didn't the foreman tell you?' 'Yes,' he said,

'He told me that he wanted me to carry ties and put in ties.'
Says I, 'Mr. Rhoades, I don't think that he told you that. What
is it?' 'Well, he wanted me to help raise the lower joints.' 'That
is it exactly. I can't get a gang over there now, and then some-
thing else will turn up.' He says 'I am not going to do it.' I
says 'Are you going to quit?' He says 'No, I am not going to
quit.' He says 'If you want me to quit, discharge me.' I says 'I
will discharge you in fifteen seconds,' and I did it right there."

Rhoades says that after he was given the beat, he grassed the
track and tightened part of the bolts, and then they stopped him
and wanted him to work on the section, "tamp ties, put in ties
and do general repairing."

Soon after he was discharged, Rhoades brought an action of
*assumpsit* in the circuit court of Kanawha County, against the
company, upon the agreement of April 27th, laying his damages
at ten thousand dollars. A demurrer, interposed by the defend-
ant, being overruled, a plea of *non-assumpsit* was entered and
issue was joined thereon and a trial was had, resulting in a ver-
dict of one thousand dollars for the plaintiff. A motion to set
aside the verdict and grant a new trial was made and overruled
and an exception taken to this as well as several other rulings of
the court and judgment was rendered on the verdict.

The overruling of the demurrer is made the basis of the first
assignment of error. Under this head, it is argued that the
paper, dated April 27, 1897, is not a contract of employment, but
at most a mere agreement to make such a contract in the future,
because it leaves for future determination the wages to be paid,
the kind of work to be performed, and the term or period of
employment. It is also said that the declaration is founded
wholly upon that paper and does not go beyond it, but it is found
that in the declaration the substance of the agreement is alleged,
and further that afterwards the "defendant ratified and con-
firmed said agreement and paid to the plaintiff the said sum of
six hundred dollars, and gave to the plaintiff a job as watchman
on its said railway, said job commencing to-wit: about December
1, 1897, at the price of one dollar per day as wages as such
watchman and continuing plaintiff as such watchman from the
date last aforesaid until to-wit: the 11th day of July, 1898."
The declaration thus makes out a complete contract, certain and
definite in all respects. It also alleges a breach of this contract
and so establishes a cause of action. It is contended, however,

that under such a contract, the plaintiff below having the right to stop work when he pleased, the railway company could discharge him.

This view of the contract, declared upon, is not in harmony with the law as expounded in the text books and decided cases. In Beach on Cont., s. 457, it is said, "Where an employe, in consideration of an agreement on the part of the employer to give him work as long as he is able to perform it, releases a claim for damages, said to have been caused by the employer's negligence, the agreement is not void because lacking mutuality. By releasing his claim, the employe has paid in advance for an optional contract, and he has the right to have it remain optional." In *Smith* v. *St. Paul R. Co.*, — Minn. —, 62 N. Rep —, Collins, Judge, says: "The consideration for the defendant's agreement to employ was paid by the release of the plaintiff's claim for damages quite as much and as effectually as if the plaintiff had actually paid cash. By releasing his claim for damages, the plaintiff paid in advance for the privilege or option of working for the defendant." This is cited in support of the text in Beach. It is true the same author says, at sec. 75, cited for defendant, "A memorandum reciting the terms of a contract of employment which are, however, 'subject to the conditions and regulations of a contract which is to be substituted for the memorandum' imposes no legal obligation." But this in no way conflicts with what is said in sec. 457, and its utter inapplicability to the case stated in the declaration, as well as to the terms of the paper, dated April 27th, is clearly apparent. Section 75 evidently relates to an agreement to give employment, not made upon a valuable consideration but in which there are simply concurrent promises, the one being the consideration for the other and the terms and conditions of these promises not complete. The paper declared upon here shows upon its face a consideration valuable in law. On the side of the employe, it is an executed contract, not of the service contemplated, but as to the opportunity to serve and receive wages therefor. By his release he has paid for this option. Moreover, this paper contains no qualifying or limiting clause, such as is found in the case put in said section 75.

It is true that the case of *Pierce* v. *Tenn. Coal, Iron & R. R. Co.*, 81 Fed. Rep. 814, cited for defendant, sustains its position, but that case went up to the Supreme Court of the United States

and was there reversed. See 173 U. S. 1. The facts in the case and the law there declared are stated in the syllabus as follows: "An agreement in writing between a mining company and a machinist stated that while in its employ he was seriously hurt under circumstances which he claimed, and it denied, made it liable to him in damages; that six months after the injury, both parties being desirous of settling his claim for damages, the company agreed to pay him regular wages and to furnish him with certain supplies while he was disabled, and carried out that agreement for six months, at the end of which, after he had resumed work, it was agreed that the company should give him such work as he could do, and pay him wages as before his injury, and this agreement was kept by both parties for a year; and then, in lieu of the previous agreements, a new agreement was made that his wages "from this date" should be a certain sum monthly, and he should receive certain supplies, and he on his part released the company from all liability for his injury, and agreed that this should be a full settlement of all his claims against the company. *Held*, that the last agreement was not terminable at the end of any month at the pleasure of the company, but bound it to pay him the wages stipulated, and to furnish him the supplies agreed, so long as his disability to do full work continued; and, that if the company discharged him from its service without cause, he was entitled to elect to treat the contract as absolutely and finally broken by the company, and, in an action against it upon the contract, to introduce evidence of his age, health and expectancy of life, and, if his disability was permanent, to recover the full value of the contract to him at the time of the breach, including all that he would have received in the future as well as in the past if the contract had been kept, deducting, however, any sum that he might have earned already or might thereafter earn, as well as the amount of any loss that the defendant sustained by the loss of his service without its fault."

In delivering the opinion of the court, Mr. Justice Gray said, "An intention of the parties that, while the plaintiff absolutely released the defendant from that claim, the defendant might, at its own will and pleasure, cease to perform all the obligations which were the consideration of that release, finds no support in the terms of the contract, and is too unlikely to be presumed." Of the same case the supreme court of Alabama said, "The con-

tract is sufficiently definite as to time and bound the defendant to its performance so long as the plaintiff should be disabled by reason of the injuries he received, which under the averment that he was permanently injured, will be for life." 110 Ala. 533. And Mr. Justice Gray said, "As we concur in that opinion, it is unnecessary to consider how far it should be considered as binding upon us in this case." The same principles are announced in *Eastern Tenn. &c. R. R. Co.* v. *Staub,* 7 Lea. 397; the *Penn. Co.* v. *Dolan,* 6 Ind. App. C. Rep. 109; and *East Line & R. R. k. Co.* v. *Scott,* (Tex.) 38 Am. & Eng. Ry. Cas. 16. But in the last case, the doctrine is qualified to this extent: "When by the terms of such compromise, the company binds itself to employ the plaintiff and it is optional with the latter to serve, there is no mutuality of contract until the plaintiff exercises the right to fix the period for which he will serve, and, until he has done so, there is no breach for which he can maintain an action."

At the instance of the plaintiff below and over the objection of the defendant, the following instruction was given:

"The court instructs the jury that if they believe from the evidence that the parties to this action compromised their difference as set forth in plaintiff's declaration and that the writing of April 27, 1897, marked 'Exhibit No. 6,' was signed by the plaintiff Rhoades after being prepared and written by defendant's agent and that said writing embodied the actual terms of such compromise and was accepted and acted upon by defendant then the defendant is bound by the provisions of said compromise." To the giving of said instruction, the defendant excepted.

At the request of the defendant, the following instructions were given:

1. "If the jury find from the evidence that the writing of May 1, 1897, marked Exhibit G. W. R. purporting to be signed by Geo. W. Rhoades, was in fact signed by him and the stipulations and conditions therein contained were different from the propositions made in writing by him on April 27, 1897, 'Exhibit No. 6,' the jury should take the writing of May 1, 1897, as embodying the terms upon which the parties finally agreed to compromise; and if the jury further believe from the evidence that the defendant had given the plaintiff work, as it had agreed to do and the plaintiff failed to work to the satisfaction of his foreman or superintendent as provided in said agreement then

the defendant had the right to discharge the plaintiff, and it would not be liable for any damages in this suit."

2. "The court instructs the jury that if they find from the evidence that at the time the plaintiff entered into the employment of the defendant after his injury he made no fixed or specified time or period which he agreed to work for the defendant then he had the right to cease working for the defendant at any time, and the defendant had the right to cease employing him at any time."

3. "The court instructs the jury that if they find from the evidence that the defendant gave to the plaintiff such work as he could do and had done and the plaintiff refused to do such work so given him then the defendant had the right to discharge him from its service and you should find for the defendant."

It is contended that it was error to give plaintiff's instruction, first, because by the paper dated May 1, 1897, the writing of April 27, 1897, was discharged and no longer formed the contract between the parties, the two papers being different and inconsistent and the former under seal; second, because it ignored the transaction of May 1st, and thus violates the rule requiring instructions to cover all essential elements of the case, to the end that the jury may not be misled; and, third, because it is inconsistent with defendant's instruction No. 1, based upon the writing of May 1st.

If two agreements of different dates, made between the same parties and covering the same subject matter, are inconsistent, the one earlier in date is impliedly discharged by the other. Clark Con. 611. In *Renard et als.* v. *Sampson et als.,* 12 N. Y. 561, the rule is stated as follows: "A written contract executed between parties, not in performance of a distinct and separate provision of prior negotiations and agreements between them, but covering in its terms or legal effect the whole subject matter thereof, extinguishes and supersedes all such prior negotiations and agreements." In *Paul* v. *Meservey,* 58 Me. 419, the law is stated thus: "One contract is rescinded by another between the same parties, when the latter is inconsistent with, and renders impossible the performance of the former." It is claimed that these two contracts or writings are different because the first states that Rhoades "is to be given a job as watchman or other service" which he can do and there is to be no discharge without "cause," while in the second he is to be given

"an opportunity to work" so long as he gives "satisfaction." The two writings are different in terms as to the matter of employment, but are they different in legal effect? Will not the allegations of the declaration, except as to the date of the instrument mentioned in it, apply to either of the two writings? If so, may not the latter be considered a ratification or confirmation of the former, and, being a receipt for the cash payment, may it not be treated as made in performance of the first rather than a new contract to take the place of it? In each case, for a valuable consideration, the defendant is bound to give the plaintiff employment, for the latter only releases his claim in consideration of the sum of six hundred dollars and "in addition" thereto the option to work for the company. The first says he shall not be discharged without cause and shall have a steady job so long as he gives satisfaction to the foreman or superintendent under whom he works. The second is silent as to cause for discharge, but repeats the language "so long as I give satisfaction to the foreman or superintendent under whom I. work." If, by the second agreement, the company is bound to give plaintiff an opportunity to work, he could not be discharged without cause, although it is not so expressly stated in the contract. In no valid contract of employment can the master discharge the servant without cause, before the expiration of the period of service contracted for. This is too elementary to require any citation of authority. As both agreements bind the company to give the plaintiff employment and declare that promise to be part of the consideration for the release, the omission of the words "will be removed only for cause" from the second is wholly unimportant, insignificant and immaterial, and does not make it legally different from the other. By the terms of the first writing, the plaintiff was to have "a job as watchman or in other service which I can perform." The second is silent as to the kind of work contemplated. Does this make them different in effect? In the construction of a contract the court must bear in mind the situation of the parties, the subject matter of the contract and the intention and purposes of the parties in making it, and should carry that intention into effect so far as the rules of language and the rules of law will permit. 2 Par. Contr. (7th Ed.) 631. All parts of the contract will be so construed as to give force and validity to all of them, and to all the language used, where that is possible. *Id.* 636. Comparatively unimportant parts or pro-

visions, which may be severed from the contract without impair-
ing its effect or changing its character, will be suppressed or sub-
ordinated, if, in that way, and only in that way, the contract can
be sustained and enforced. *Id.* 637. To so construe this second
paper as to make it the duty of the plaintiff to do any and all
kinds of railroad work would put upon it a construction at
variance with the law and so utterly ridiculous and absurd that
it cannot be supposed for a moment that such was the intention
of either of the parties. In every case of a contract of employ-
ment where the parties know each other and the purposes of
each other, at the time of entering into it, as they did here, and
the terms of the contract are not to the contrary, the servant
only engages to perform such service as he "can perform." If
a person engage to do service which he cannot perform, his in-
competence is cause for discharge. If a person make a binding
contract to give employment which he fails to furnish for any
reason not attributable to the fault of the employe or an act of
God, such failure is a breach of the contract and an action lies.
In this second writing, the kind of service not being mentioned,
while in the first it is, it cannot be said that there is any contra-
diction between the writings as to the kind of service. But, if
the second contract stood alone, this man was known, at the time
of his employment, not to be qualified for the duties of a brake-
man, fireman, engineer, conductor, or other position, requiring
special knowledge, training, experience and skill. It was well
understood between the parties that the company had other posi-
tions, the duties of which the plaintiff could perform, although
he had but one leg. It could not have been in the contemplation
of either of the parties that he would be required to do any work
that such a man could not perform. No provision of the con-
tract requires such a construction and to so construe it would
wholly destroy its value to the plaintiff and defeat the intentions
of the parties. It is not reconcilable with their situation, the
subject matter of the contract, or their purpose, object and in-
tention, apparent upon the face of the contract itself as well as
from the conditions under which the contract was entered into.
So, in legal effect, the two papers are alike. There was but one
contract to which both relate, neither nor both of which contains
it all, for the actual employment took place after the execution
of both, and resort may be had to both for its terms as far as they
go. Freed from all erroneous conceptions of the case, the in-

struction given for the plaintiff tells the jury substantially that the defendant is bound by that contract, and the first instruction given for the defendant, that the plaintiff was also bound by it and if he had failed to work to the satisfaction of his foreman or superintendent as provided in the agreement, the defendant had the right to discharge him.

But upon the defendant's theory that the two papers are separate and distinct and inconsistent and the first, therefore, discharged by the execution of the second the other two criticisms upon the instruction, given for the plaintiff, must be disregarded for the reason that the execution of the writing of May 1st, was in issue and to be determined by the jury. This writing was not mentioned in any of the pleadings of the case, but came into the case as evidence under the plea of *non-assumpsit.* The plaintiff denied on oath that he had signed it. Two witnesses testified that he did sign it in their presence. This made it necessary for the jury to say which of the two writings constituted the contract between the parties. Section 40, chapter 125 of the Code, reading, "Where any declaration or other pleading alleges that any person made, indorsed, assigned or accepted any writing, no proof of the handwriting of such person shall be required, unless the fact be denied, by an affidavit with the plea which puts it in issue," does not apply to writings so brought into the case. At common law, the adverse party had the right to require precise proof of all signatures and documents, making part of the claim of the party producing them, but this has been greatly modified—in some states, by rules of court, and in others by statute. 2 Greenl. Ev. s. 16. In Virginia, an act was passed February 5, 1828, dispensing with proof of the handwriting, "if the *declaration* alleges that they were signed by any person," unless an affidavit be filed disputing its genuineness. In 1850, after this statute was construed by the court in the case of *Kelley* v. *Paul,* 3 Grat. 191, the legislature passed the act as now found in said section 40, applying the rule to any writing, alleged in *any* pleading to have been made, etc. The instruction for plaintiff is not open and the other objection that it ignores the transaction of May 1, 1897, upon the principles announced in the cases of *McCreery* v. *R. R. Co.,* 43 W. Va. 110, and *Price* v. *Ry. Co.,* 46 W. Va. 538, because an instruction for the defendant was given, covering said transaction as a part of its theory of the case.

So, upon the plan of the defense, the case presented, and the evidence related to two theories, one upon the hypothesis that the contract was embodied in the writing of April 27th, and the other upon the hypothesis that the writing of May 1st formed the contract. In such case, inconsistency in the instructions, if, indeed, there be any because of the conflict, is no objection and does not violate the rule referred to in the brief. Each of them is general, covering the whole case upon one of its theories. Each party is entitled to an instruction upon his theory of the case, if there is any evidence to sustain it. The conflict thus presented is of the issue itself, the very bone of contention in the case, and is not an inconsistency in the instructions. The instructions thus presenting the contradictory theories and declaring the law upon each of them, it is for the jury to determine what the facts are and thus apply the law as announced in one of the instructions and reject that contained in the one conflicting with it as inapplicable to the case, in arriving at a verdict. The language of defendant's first instruction shows that the application to the case of the principles of law, embodied in it, was dependent upon the finding of the jury as to whether Rhoades signed the writing of May 1st, for it says: "If the jury find from the evidence that the writing of May 1, 1897, marked, etc., was in fact signed by" Rhoades, etc., "the jury should take the writing of May 1, 1897, as embodying the terms," etc. So the conclusion is that the assignment of error, predicated upon the giving of said instruction, is not well taken.

The last assignment of error is grounded upon the refusal of the court to set aside the verdict and allow a new trial, it being insisted under this head that the work the plaintiff refused to do was such work as he could have done and not so laborious as some of the work he had already done; that as, under the contract, the defendant might discharge the plaintiff, when he ceased to "give satisfaction to the foreman or superintendent under whom" he worked, and he had complained all the time of the work assigned him, he was rightfully discharged under that clause of the contract; that it is uncontradicted that the plaintiff refused to do work assigned him; and that, if the recovery might be for the probable life of the plaintiff, there was no evidence of his habits and expectation of life, and, therefore, no evidence upon which the damages allowed could have been assessed.

The refusal to do the work assigned at the time of the dis-

charge is admitted, but the plaintiff claims it was of such character that he was not bound to do it. It may not have been harder than some other work he had done, but that is not the test. The issue was whether it was beyond his ability to perform without undue exertion. Upon this question, the jury had before them the nature of the work, the crippled condition of the plaintiff, all the facts and circumstances of his discharge, and the law of the case, dependent upon the facts, and it was their province to say what the facts were and thus determine whether there was cause for the discharge. The evidence is conflicting as to what was required of him when he refused to perform it. On this point Clifford and Spencer are not in accord and both of them differ from Rhoades. Then as to what work the plaintiff was able to do was a matter for the jury, and he was before them and they saw his condition as well as the demeanor of himself and the other witnesses. In addition to this it must be remembered that the burden was upon the defendant to show that the discharge was for good cause. 14 Am. Eng. Ency. Law, 797. His complaining from time to time about the kind of work assigned him is unimportant, if even relevant, for the reason that the work he did do was satisfactory to the foreman and supervisor of track.

The principles governing the assessment of damages and the measure of damages in cases of this kind have been given. *Tenn. Coal, Iron & R. R. Co., supra.* They are very similar to those applying in cases of damages for injuries to the person in which the amount is dependent upon loss of capacity for labor. In these cases, the standard mortuary tables are some times admitted as evidence on the question of the expectation of life. 5 Am. Eng. Ency. Law, 41-42 note. But it is not always done, nor has it been held necessary. Here the age and physical condition of the plaintiff were proved, and no reason is perceived why plaintiff's expectation of life should not have been left to the jury in this case, as is so often done in others, involving the same question, without more evidence bearing upon it than was before the jury.

There being no error in the judgment, it is affirmed.

*Affirmed.*