Abraham TOW, Plaintiff,

v.

MINERS MEMORIAL HOSPITAL ASSO-
CIATION, INC., a corporation,
Defendant.

United States District Court
S. D. West Virginia,
at Huntington.

Dec. 2, 1961.

Edward H. Tiley, Jr., and John E. Davis (Kay, Casto & Chaney), Charleston, W. Va., for plaintiff.

M. E. Boiarsky, Charleston, W. Va., Harold H. Bacon and Val J. Mitch, Washington, D. C., for defendant.

HARRY E. WATKINS, District Judge.

This is an action in which the plaintiff, Dr. Abraham Tow, a pediatrician, seeks to recover damages from defendant, Miners Memorial Hospital Association, Inc., a corporation, for breach of an employment contract. Defendant made a motion for summary judgment, which was denied on October 18, 1960, for the reason that the Court was "not yet convinced that there is no issue of fact in controversy." Since that time the defendant has made a renewal motion for summary judgment, two additional affidavits, and two additional exhibits have been filed in support thereof, a pretrial conference has been held, additional pretrial briefs have been filed, and the Court has had more time to study the cases cited on both the original motion and the renewal motion for summary judgment. The Court is now convinced that there is no genuine issue as to any material fact and that the defendant is entitled to a judgment as a matter of law. This decision is now reached, not alone because of the additional affidavits and exhibits that have been filed, but because of a more thorough understanding of the case brought about by a lengthy pretrial con-

ference, and time to permit a more thorough study of the law based upon the entire record.

The pleadings, admissions, affidavits and exhibits therewith, filed by both parties upon the pending motion, when considered in the light most favorable to plaintiff, show the following material facts:

On October 30, 1958, Tow addressed a letter to the Association's Clinical Director, stating he was interested in an advertisement appearing in the Journal of the American Medical Association for a full-time pediatrician, and requesting further details. After stating some of his background, he concluded that: "Pediatric practice in Manhattan has moved to the suburbs and I refuse to follow it. Your proposition sounds like an interesting challenge. May I hear more?" On October 31, 1958, defendant's Associate Clinical Director, Dr. Sarah H. Knutti, replied, advising that there were two vacancies for pediatricians. In this letter Knutti enclosed a printed memorandum, entitled "Information for Applicants for Medical Staff Appointments," a provision of which reads as follows:

"Full-Time salaried physicians receive *a letter-type contract* stating that 'Your employment will not be terminated except by mutual consent or for just cause. In the event of disagreement regarding termination, the matter will be referred to a board of physicians of the MMHA for opinion and recommendation.' " (Emphasis added.)

The next sentence in the "information sheet" reads as follows:

"*Physicians are not required to 'sign-up' for any specific period of service.*" (Emphasis added.)

There was also enclosed in the Knutti letter to Tow an application for medical staff appointment, which Tow was requested to complete and return to defendant, and about November 7, the completed application was received by defendant Association. On December 1, Tow discussed appointment to the hospital staff of the Association's Hospital at Man, W. Va., with Drs. Meade and Knutti in the Association's Washington office, and on December 3, 1958, Tow conferred by telephone with Knutti and was orally offered and orally accepted the position as Chief of Pediatrics at the Man Hospital at a salary of $20,000 per year; subject, however, to the provisions of the "letter-type contract" mentioned in the above-quoted portions of the "information sheet." This is true because Tow, in his affidavit, makes it clear that he made application for the position and accepted the position orally on the basis of the terms of the "information sheet." On the same day, Knutti confirmed the conversation by letter, dated December 3, 1958, which stated in part that "we will prepare a formal appointment letter."

On December 5, 1958, in accordance with Knutti's telephonic conversation with Tow, and the Knutti letter of December 3, Meade addressed a letter to Tow, transmitting a letter of the same date signed by Dr. Morrison as President of defendant's Board of Directors, offering plaintiff the position of Senior Pediatrician and Chief of Pediatrics on the staff of the Man Memorial Hospital. The Meade-Morrison letters constituted the "letter-type contract" referred to in the "information sheet" to be received by full-time salaried physicians, and constituted the "formal appointment letter" referred to in the Knutti letter of December 3. This is a fair and unmistakable inference from the language used in those documents. No other inference can reasonably be drawn therefrom. Tow was required to execute the appointment letter as an indication of acceptance and to return the copies to defendant. In this "letter-type contract," Meade, Clinical Director of all the Association's hospitals, outlined "the details of your appointment," stating the annual salary to be $20,000, plus yearly increments of $1,000 for each of the first five years of continuous service. The letter then concluded:

"*This appointment is to remain in effect as long as you render satis-*

*factory service* in carrying out the Association's medical and hospital care program as presently constituted. In resolving questions as to the satisfactory nature of your services, the Association will appoint a board of from three (3) to five (5) physicians holding appointments on the staffs of other hospitals of the Miners Memorial Hospital Association to go into the matter, and the Association will be guided by their recommendation." (Emphasis added.)

No protest was made by Tow as to the contents of the Meade-Morrison letters, and nothing was said by him to indicate that he was in any way dissatisfied with the final "letter-type contract." Instead, by letter dated December 11, 1958, he responded to the Meade-Morrison letters. He thanked Meade for his December 5 letter, and in his letter to Morrison, President of defendant's Board of Directors, he enclosed "the three copies signed as requested," thereby accepting the appointment under the terms of the Meade-Morrison letters. It was not until January 2, 1959, that plaintiff commenced his duties at the Man Memorial Hospital.

Prior to August 14, 1959, defendant determined that Tow's services, then being rendered as Chief of Pediatrics at the Man Memorial Hospital, were unsatisfactory, and placed him on administrative leave by letter dated August 14, 1959, which Tow acknowledged on August 17. Since Tow questioned the determination that his services were unsatisfactory, the Association appointed a Board of Review pursuant to the terms of the Meade-Morrison letters of December 5, 1958, composed of five physicians "holding appointments on the staffs of other hospitals of the Miners Memorial Hospital Association," so agreed upon. This Board of Review, appointed to consider the question of whether Tow's professional pediatric competence and performance warranted his continuance in the capacity of Chief of Pediatrics at the Man Memorial Hospital, was directed not to come "to any conclusion until it has reviewed all the facts impartially." Tow was advised of the appointment of the Board of Review, and was requested, by letter dated August 25, 1959, to be present at the Board's meeting. This letter also explained that Tow "will be given an opportunity to make whatever statements you feel are indicated to assist the Board in making its recommendations." The Board of Review held its meeting on September 2, 1959, and unanimously concluded that Tow's services were not satisfactory, stating:

"Considering the present situation at the Memorial Hospital at Man, West Virginia, it is the opinion of this Board of Review that Dr. Abraham Tow is not capable of functioning as Chief of Pediatrics at the hospital."

On November 12, 1959, Tow's employment was terminated by letter, at which time he was given 30 days severance pay.

In his affidavit and in his briefs, Tow contends that his employment contract was that of December 3, 1958, consisting of his telephone conversation with Knutti, the "information sheet" and the confirmation of that oral conversation by letter from Knutti dated the same day. He denies that he was working under any contract of employment "dated December 5, 1958," and denies that his tenure of employment was based upon "satisfactory" service. However, on August 31, 1959, Tow wrote to John W. Williard, M. D., Chairman of the Board of Review, in which he stated:

"It is my understanding that this Board of Review has been convened for the purpose of reviewing my services as Chief of Pediatrics at the Man Memorial Hospital, Man, West Virginia, *to determine whether or not my services have been satisfactory pursuant to the terms of my contract of employment with the Miners Memorial Hospital Association, dated December 5, 1958.*" (Emphasis added.)

In resisting the motion for summary judgment, plaintiff states in his

brief that "plaintiff believes that one arrives at the crux of this case in that there is clearly present a genuine issue as to a material fact, and that issue is: When was the contract consummated? and What were its terms and conditions?" The Court agrees that these are the two issues to be determined. The Association contends that the Meade-Morrison letters of December 5, 1958, constituted the employment contract. Tow contends that the oral conversation of December 3, 1958, with Knutti, the "information letter" and the confirmation letter of Knutti, also dated December 3, 1958, constituted the employment contract. The "information sheet" and the oral conversation of December 3, 1958, referred to termination of services for "just cause," whereas, the Meade-Morrison letters of December 5 made the test "satisfactory service." The answer to both of these questions is found in Tow's own words quoted above, wherein, as late as August 31, 1959, he refers to *"my contract of employment * * * dated December 5, 1958,"* and to the terms of his employment contract being based on *"satisfactory"* service. His statement that his contract of employment was dated December 5, 1958, supports defendant's contention, and his use of the word "satisfactory" is totally and wholly consistent with Meade's letter that Tow's appointment "is to remain in effect as long as you render satisfactory service." But, even in the absence of any such admission, the Court must find as a matter of law that the Meade-Morrison letters constitute the employment contract. If the Court permitted the jury to decide this question and they decided otherwise, it would be necessary to set aside such verdict as contrary to the law and evidence.

The "information sheet" relied upon by Tow stated that "Full-time salaried physicians receive a letter-type contract." The Knutti letter of December 3, also relied upon by Tow, states that "we will prepare a formal appointment letter." The Meade-Morrison letters constituted the "letter-type contract" referred to in the "information sheet" and constituted the formal appointment letter referred to in the Knutti letter. In the Meade letter of December 5, Meade made clear to Tow that he (Meade) was "outlining for you here the details of your appointment." The letter concluded:

"This appointment is to remain in effect as long as you render satisfactory service in carrying out the Association's medical and hospital care program as presently constituted. In resolving questions as to the satisfactory nature of your services, the Association will appoint a board of from three (3) to five (5) physicians holding appointments on the staffs of other hospitals of the Miners Memorial Hospital Association to go into the matter, and the Association will be guided by their recommendation."

He was asked to sign the appointment letter, and to return executed copies to the Association, as evidence of his acceptance of the contract of employment as set forth in the Meade-Morrison letters. He does not contend that he did not read or understand the letters. Without any complaint, or any objection or comment that the "letter-type contract" of Drs. Meade and Morrison, changed or modified in any way the method of termination of employment as set forth in the "information sheet," or his oral conversation with Knutti, plaintiff Tow signed his name after the word "Accepted" at the bottom of the appointment letter and returned copies thereof, expressing pleasure with the prospects of joining the hospital staff.

To say that Tow's employment contract was the Knutti conversation ignores the recitals of the Knutti letter of the same date that "we will prepare a formal appointment letter," as well as the statement in the "information sheet" to the effect that physicians would receive a "letter-type contract," and the recitals in the Meade letter purporting to outline "for you here the details of your appointment," and Tow's written acceptance thereof, and Tow's letter of August 31,

1959, wherein he refers to "my contract of employment" with Miners Memorial Hospital Association, dated December 5, 1958. There can be no question that Tow's written acceptance following receipt of the Meade-Morrison letters was his approval of the contents of such letters. To argue otherwise would render meaningless Tow's written acceptance and all the other recitals in the various letters and documents mentioned above. Even though the Knutti conversation with Tow on December 3, and the Knutti confirmation letter of the same date (which recognized the necessity of a "formal appointment letter" as did the "information sheet") are to be regarded as constituent parts of the employment contract, the Meade-Morrison letters, accepted by Tow, must be regarded, as a matter of law, as forming and constituting the finalizing memoranda evidencing the terms of the employment contract, and are binding upon plaintiff Tow.

It is significant that the events connected with the employment contract all occurred within a short space of time in early December, beginning on December 1 and ending with plaintiff's written acceptance on December 11, *all prior to plaintiff's assumption of employment on the following January 2, 1959.*

Any inconsistency as to termination of employment provisions in the Meade-Morrison letters and the "information sheet" must, under well settled principles of law, be construed in favor of the language contained in the Meade-Morrison letters of December 5. The rule is stated in 12 Am.Jur. Contracts, Sec. 253, p. 797, as follows:

"Written and Printed Matter.— It is a well-settled rule of law that where part of a contract is written and part is printed, and the written and printed parts are apparently inconsistent or there is reasonable doubt as to the sense and meaning of the whole, the words in writing will control. The reason greater effect is given to the written than to the printed part of an agreement, if they are inconsistent, *is that the written words are the immediate language and the terms selected by the parties themselves for the expression of their meaning, while the printed form is intended for general use, without reference to particular objects and aims.* This rule is prescribed by statute in some jurisdictions.

"Similarly, where there is a conflict between written and typewritten provisions, the written provisions prevail." (Emphasis added.)

In Restatement of the Law of Contracts, Sec. 236, pp. 327, 328, the same rule is stated, in part, as follows:

" * * * (e) Where written provisions are inconsistent with printed provisions, an interpretation is preferred which gives effect to the written provisions."

Plaintiff Tow accepted the finalizing contract containing the statement that his appointment would remain in effect "as long as you render satisfactory service in carrying out the Association's medical and hospital care program as presently constituted."

In United States ex rel. International Contracting Co. v. Lamont, 155 U.S. 303, 15 S.Ct. 97, 99, 39 L.Ed. 160, a contractor seeking to recover on the basis of the government's having accepted a plaintiff's low bid, entered into a contract for a lesser sum, following the government's rejection of the first bid. The Supreme Court stated:

"He entered of his own accord into the second contract * * * and has taken advantages which resulted from his action under it, having received the compensation which was to be paid under its terms. * * * A party cannot avoid the legal consequences of his acts by protesting, at the time he does them that he does not intend to subject himself to such consequences."

It quoted (155 U.S. p. 310, 15 S.Ct. p. 99) with approval its earlier declaration

in Gilbert v. United States, 8 Wall. 358, 19 L.Ed. 303, as follows:

"If the claimants had any objection to the provisions of the contract they signed, they should have refused to make it. Having made it and executed it, their mouths are closed against any denial that it superseded all previous arrangements."

This language is very pertinent to the facts of this case.

Plaintiff, in his affidavit, says that he did not intend to subject himself to the provisions of the December 5 contract which he signed, and asks the Court to submit the question to a jury. Under the facts in the record, this is not a jury question, and plaintiff is bound by the contract, which he made, as a matter of law.

■ Since the appointment was "to remain in effect as long as you render satisfactory service in carrying out the Association's medical and hospital care program," and "in resolving questions as to the satisfactory nature of your services," the Association was to appoint a Board of Review "to go into the matter, and the Association will be guided by their recommendation," the next question arises as to who was to make this decision as to "satisfactory service in carrying out the Association's medical and hospital care program." Was it the Association, the Board, or is this decision to be made by a lay court or lay jury? This ultimate decision was for the Association to make under the limitation that it was to be guided by the opinion and recommendation of the Board of Review.

■ Contractual language "by which one agrees to employ another as long as the services are 'satisfactory', or which is otherwise expressed to be conditional on the satisfactory character of the services rendered" accords to the employer the right to terminate the employment contract, if the employer is dissatisfied, and "the employer is the sole judge as to whether the services are satisfactory; the court cannot substitute its judgment as to the reasonableness of the grounds of dissatisfaction." 35 Am.Jur., Master and Servant, Section 28, p. 463, 464. To the same effect, see Shepherd v. Union Central Life Ins. Co., 5 Cir., 74 F.2d 180, 183, where the Fifth Circuit, affirming a directed verdict, said:

"A jury would not have been authorized to disbelieve the officials who testified to a real dissatisfaction and the court did not err in directing a verdict for the defendant."

In Ferris v. Polansky, 191 Md. 79, 59 A.2d 749, 752, the Maryland court expressed the applicable law thus:

"In a contract where the employer agrees to employ another as long as the services are satisfactory, the employer has the right to terminate the contract and discharge the employee, whenever he, the employer, acting in good faith, is actually dissatisfied with the employee's work. This applies, even though the parties to the employment contract have stipulated that the contract shall be operative during a definite term, if it provides that the services are to be performed to the satisfaction of the employer. *It is not necessary that there exist grounds deemed adequate by the trier of the facts for the employer's dissatisfaction. He is the judge as to whether the services are satisfactory.*" (Emphasis added.)

■ This rule is particularly important under this contract where satisfactory service specifically relates to "carrying out the Association's medical and hospital care program." It is clear that such language relates to the satisfaction of the employer. The operation of a hospital necessitates the reservation by the hospital of the right to determine the matter of whether an individual physician is rendering satisfactory service in connection with its medical care program. A hospital in West Virginia must maintain standards imposed by an authorized agency of the State. West Virginia Code, ch. 16, art. 5B, § 8 (Michie

1955). It serves the public health, and public policy demands that the hospital keep its standards high and renders competent service. It is under certain legal duties and obligations to its patients. Here Tow's services were to be accordant with the hospital's medical and care program, which, in turn, afforded defendant the right to set such standards as it deemed requisite to fulfilling its obligations to those who sought services at the hospital. Here plaintiff, in accepting the employment contract, voluntarily assumed the hazards of a satisfaction contract. See 6 A.L.R. 1502–3, where it is stated:

> " 'If parties voluntarily assume the obligations and hazards of a satisfaction contract, their legal rights are to be determined and adjudicated according to its provisions. It is elementary that courts cannot make contracts for parties nor relieve them of the consequences of their contracts, however ill-advised.' "

The Annotation distinguishes between a situation such as is herein involved and one where satisfaction is based upon mechanical fitness. It states (6 A.L.R. 1502):

> " 'In many cases of this nature which have been before various tribunals, there are recognized two quite well-defined classes,—one where the personal taste, feeling, sensibility, fancy, or individual judgment of the party to be satisfied is especially involved; the other where mechanical utility or operative fitness in relation to which some standard is available is bargained for. In the former class the authorities preclude disputing the propriety or reasonableness of the declaration of dissatisfaction on the part of the individual entitled to exercise it. It is said to be with him purely a personal matter of which he is made the sole judge. It being his right to say whether he is satisfied or not, it cannot be left to another to say that he ought to be satisfied. In the lat-

ter class of cases the authorities are more conflicting.' "

The Annotation cogently states:

> "In view of the personal relationship between master and servant and the various possible grounds for dissatisfaction of an employer with a skillful employee, who, although he produced an article of first-class quality, might, for instance, conceivably be detrimental to the business because of his effect on other employees, and the difficulty of a jury's judging of questions of this kind, it seems that the reasonableness of the employer's dissatisfaction should seldom, if ever, be a question for the jury, unless there are special provisions in the contract or extraordinary circumstances in the situation of the contracting parties requiring such a construction of the contract. And it appears to be clear that a case holding that reasonable cause for dissatisfaction must exist in order to justify rejection by the buyer in case of a contract of sale of a chattel is distinguishable on principle from the usual case of continuing personal services in contracts of employment involving the relation of master and servant."

These annotations are most applicable to a hospital for the reasons above stated. The individual judgment of the hospital is especially involved in setting its standards of hospital and medical care, and in seeing that those employed are capable to effectuate those standards. The Hospital Association must fix these standards since there are no criteria available such as there would be in determining the mechanical utility or operative fitness of a mechanic or laborer. Until such standards are fixed by the hospital, it is not possible to determine either "satisfactory service" or "just cause."

Defendant does not concede, and it is not necessary to decide, whether defendant could terminate plaintiff's services for reasons of unsatisfactory service without the appointment of the Board of Review

or whether the Hospital Association could act contrary to the decision of the Board of Review. Defendant does not concede that it would be bound by the finding of the Board, since the terms of the contract provided only that the defendant will be "guided" by the "recommendation" of the Board, and the use of the word "guided" indicates that the ultimate decision was to be made by someone else—in this case, the Association. However, that question is not involved here since the Board's conclusion that "Dr. Abraham Tow is not capable of functioning as Chief of Pediatrics" at the Man Memorial Hospital supports the determination by defendant that plaintiff's services were not satisfactory as to the position in which he had been employed. The opinion and recommendation of the Board made mandatory defendant's decision to terminate plaintiff's employment, since it might have become liable for any damages resulting from his professional activities in the course of his employment when his lack of proficiency became a matter of record as a result of the Board's conclusions. After defendant had the advantage of the Board's conclusions, and was guided by its recommendation, the only possible contractual restriction upon defendant's termination of the contract of employment had been eliminated.

If the provision that the Association was to be "guided" by the recommendation of the Board meant that the Board was to have the final determination, which is not a reasonable interpretation, then again the plaintiff has no action, because the recommendation of the Board and the action of the Association were in accord. Defendant offered plaintiff another position in one of its hospitals at Pikeville, Ky., where he would not be Chief of Pediatrics, but plaintiff declined this offer.

Even under the provisions of the "information sheet" upon which the alleged oral agreement of December 3 was based, the Association had the right to determine that plaintiff's employment should terminate. Plaintiff urges that his employment contract called for a "permanent" position and that it resulted from his conversation with Knutti on December 3, when Knutti assured him that he would have tenure as set forth in the "Information for Applicants" sheet. This "information sheet," in addition to the "just cause" provision, provides that "in the event of disagreement regarding termination, the matter will be referred to a Board of Physicians of the MMHA for opinion and recommendation." This quoted language follows immediately after the "just cause" provision.

■■ It is a general rule of law that, absent contract limitation, an employer may discharge his employees at will and without cause, and this total right was available to the Hospital Association, except, as it was limited and circumscribed by the quoted language in the "information sheet." The phrase "just cause" does not stand alone, and it must be read in context and conjunction with the succeeding sentence that in the event of disagreement regarding termination "the matter would be referred to a Board of Physicians for opinion and recommendation." The disagreement referred to is that the Hospital Association would contend that "just cause" existed and Tow would contend that it did not. In such event the parties expressly agreed that a reference would be made to the Board "for opinion and recommendation," and this limited reference is significant. There is nothing in the "information sheet" whereby the Association surrendered totally its right to make the final determination as to whether Tow's employment was to be terminated. This is not similar to a contract where the parties agree to submit their dispute to an arbitration board and agree that the decision of the board shall be final and binding. This case cannot be compared with those cases cited by plaintiff where only the words "just cause" or "satisfactory service" are used in the contract, and the parties did not agree on any procedure to resolve or determine "just cause" or "satisfactory service" as was done here under both the alleged contract of December 3 and that of December 5. Here

the Hospital Association, because of the very nature of its work, could not surrender such a right. Instead, it was willing only to have the physician board give its opinion and recommendation, the ultimate decision as to just cause remaining with the Hospital Association. The words "opinion and recommendation" themselves are significant. They show that the final decision rested elsewhere, and that someone else was to have the benefit of the Board's opinion and recommendation to make the ultimate decision. Obviously, such recommendation would only be made to the Association, the acting party, to help it reach its decision. Here the Board's opinion and recommendation reflect justification for the Hospital Association's action in terminating the employment.

It is inherent in plaintiff's position that a lay jury, not the Hospital Association, or even the physicians constituting the Board of Review, should now determine the acceptable standards for patient care at the Man Memorial Hospital. At the pretrial conference, plaintiff indicated that he would call as witnesses patients and physicians, whose evidence was not before the Board of Review, to testify as to plaintiff's ability and services at the hospital, and the result of treatment furnished. Under this employment contract, such evidence would be irrelevant and could not be admitted. The Board's opinion was to be only advisory, the ultimate decision resting with defendant.

Even under Tow's argument that the oral contract of December 3 is the final contract and binding on defendant, he is still bound by the tenure provisions that the determination of the "just cause" dispute be submitted to the Board for opinion and recommendation. Now that the Board opinion and recommendation is against him, he proposes that the Board opinion be subordinated to the views of other doctors, and proposes to have a lay jury decide the standards of medical care to be furnished the patients at the Man Memorial Hospital, and whether plaintiff's services as Chief of Pediatrics fulfilled these standards.

Since Tow's employment at the Man Memorial Hospital was as Chief of Pediatrics, his competency as a physician is not the issue. In his affidavit he complains that the Board's conclusions that he "is not capable of functioning as Chief of Pediatrics at the Man Memorial Hospital" is not based on plaintiff's incompetency. as a physician. Termination for "just .cause" related to his employment as Chief of Pediatrics and not as a mere physician.

The facts show that the Board went into much detail, in making their study, including "1. A chart audit of 80 consecutive charts of patients seen by Dr. Tow as in-patients, out-patients and in the newborn nursery; 2. Interviews with several of Dr. Tow's colleagues, and 3. An interview with Dr. Tow by the assembled Board." There is nothing whatever to indicate that their opinion and recommendation was arbitrary or capricious or that they failed to make a fair and impartial investigation. Neither is there any claim by the plaintiff that there was any fraud in the procurement of the ultimate contract, as there is in many cases where parol evidence is offered to vary the terms of a written contract.

A second defense raised is that the alleged employment contract is unenforceable because of lack of consideration. Plaintiff says that the employment contract was bilateral and that there was mutuality of obligation. Defendant says that by the very terms of the contract upon which the plaintiff relies, plaintiff was not obligated to work for the defendant and could have quit at any time without legal liability for breach of contract; that the information sheet expressly provides that "Physicians are not required to 'sign up' for any specific period of service"; that the contract sued upon was unilateral, and there was no mutuality of obligation.

■■ Mutuality is essential, absent an independent executed consideration. Where there is no other consideration for a contract, mutual promises must be binding on both parties. But even

though one of the parties has made no promise and is bound by no duty, the contract has sufficient mutuality of consideration to be binding if he has given an independent executed consideration. The Court agrees with the defendant that the contract in this case was clearly a unilateral contract. Plaintiff cites McGuire v. Old Sweet Springs Co., 73 W.Va. 321, 79 S.E. 350 (1913), in support of his position that his acceptance of the contract, by entering into defendant's employ at Man, West Virginia, made the contract bilateral and binding upon both parties. The McGuire case is not in point because in that case there was no express provision, as there is here, to the effect that plaintiff was "not required to 'sign up' for any specific period of service."

■ There is no dispute in this case as to these general propositions relating to bilateral and unilateral contracts. Since the Court has decided that the contract was unilateral, the dispute is restricted to a determination of whether Dr. Tow gave an independent executed consideration to make it enforceable. In the determination of this issue the weight of authority in this country makes it clear that the mere rendition of services by one to another is not consideration—that, to make defendant's promise enforceable, plaintiff must have given something in addition to his services.

In 18 R.C.L., Master and Servant, § 20, p. 509, the general rule is stated: if the employee *purchases* the employment with a valuable consideration outside *the services which he renders from day to day*, the term "permanent" employment will be held to contemplate a continuous engagement to endure as long as the employer is engaged in business and has work for the employee to perform, and also as long as the employee performs his service satisfactorily; but in cases where no such independent consideration exists, the rule is that the hiring is terminable at will. The rule is succinctly stated in Annot., 35 A.L.R., page 1432:

"In most of the jurisdictions passing on the duration of a contract pur-

porting to be for permanent employment, it is held that, in the absence of additional express or implied stipulation as to the duration of the employment or of a good consideration *additional* to the services contracted to be rendered, a contract for permanent employment, for life employment, for as long as the employee chooses, or for other terms purporting permanent employment, is no more than an indefinite general hiring terminable at the will of either party." (Emphasis added.)

See the many cases cited there and supplemented by Annot., 135 A.L.R., page 646.

This is the rule in West Virginia under Wright v. Standard Ultramarine & Color Co., 141 W.Va. 368, 90 S.E.2d 459 (1955). In that case the amended declaration stated that plaintiff, who had intended to quit his job, abandoned the idea and agreed to continue in defendant's employ in consideration of defendant's promise of a retirement plan and additional fringe benefits to him. The Court held that this was not sufficient to state a cause of action since:

"* * * there is no allegation of any consideration for such agreement * * *. There is no allegation that the plaintiff *paid* anything or gave any consideration for any contract for his employment by the defendant * * *. Ordinarily a contract of employment for as long as an employee satisfactorily performs his duties is of indefinite duration and terminable at will by either party unless such contract is supported by a *consideration other than the obligation of service to be performed* by the employee and the obligation of the employer to pay wages or salary for such service. 56 C.J.S. Master and Servant, § 31." 90 S.E. 2d at page 467. (Emphasis added.)

In effect the Court also held that the mere continuance in employment, and the attendant surrender of the right to quit and seek other employment, would not be

consideration to create a binding promise. It is true that the rule in Virginia is to the contrary. In Twohy v. Harris, 194 Va. 69, 72 S.E.2d 329 (1952), the Virginia court held as enforceable a promise by defendant to hold ten per cent of certain corporate stock for plaintiff since this promise was supported by the consideration which plaintiff gave when he " * * * refrained from exercising his right to quit the employment, and fully performed the required services for a period of nearly seven years." 72 S.E.2d at page 335. But the parties here agree that this case is controlled by West Virginia contract law, and that this Court is bound to follow that law. It may be added that this Court would be inclined to follow the West Virginia rule even if it were not bound to do so, since the rule accords with the weight of authority and the better reasoning among the jurisdictions.

Having determined that the consideration given by plaintiff must be *independent* of the services rendered by him to defendant, we pass to the merits of plaintiff's contention that the closing of his practice in New York, the severing of his professional and social ties there, and the moving to Man, West Virginia, to go to work for defendant constituted such " * * * consideration other than the obligation of service to be performed. * * * " so as to make the contract enforceable against defendant. In this regard the Court gives full weight to the allegations in the complaint that plaintiff " * * * until December 5, 1958, was actively engaged in the practice of his profession. * * * " in New York, and that " * * * he gave up the practice he had built up over a long period of time in the City of New York. * * * " to accept the appointment at the Man Memorial Hospital. Full weight is also given to Dr. Tow's avowal, in his affidavit, that Dr. Knutti led him to believe that defendant wanted him (Tow) to consider this position as permanent, and that upon terms as discussed by Tow and Knutti, Tow " * * * took steps to close his office in New York City, * * *

began discharging his patients and gave up his practice, preparatory to moving to Man, West Virginia, to assume his duties with Man Memorial Hospital. * * * * "

There is a division of authority in this country as to whether the giving up of a private job, business, or profession, or a position in the government, may constitute sufficient consideration so as to prevent a contract purporting to be for permanent employment from being terminable at the will of the employer. The majority, and the sounder, rule is that such a surrender, when a necessary incident to the acceptance of the new employment, is not such consideration as will make enforceable an otherwise unenforceable contract. This rule is well-illustrated by the case of Savage v. Spur Distributing Co., 33 Tenn.App. 27, 228 S.W.2d 122, 125 (1949). There, plaintiff, an accountant, was promised "a permanent job [that] would last as long as he performed the work satisfactorily" and this resulted in plaintiff's moving his family from Pittsburgh, Pennsylvania, to Nashville, Tennessee. The Tennessee court rejected the argument that such removal and purchasing a home at an inflated price constituted consideration sufficient to support a permanent employment contract. The Tennessee court said:

"These things, however, do not appear to have been mutually understood by the parties as any part of the agreed exchange or consideration. Defendant's offer was only for plaintiff's services as its assistant secretary. This was the only consideration moving to it. These other things were of no benefit to it. At most they were merely a detriment to him incident to preparing himself to accept its offer—only the same form of detriment that ordinarily results to any employee who leaves one employment and goes elsewhere to accept another."

In Adolph v. Cookware Co. of America, 283 Mich. 561, 278 N.W. 687, 689, (1938)

where plaintiff, a *chiropractor in practice* at Carrollton, Georgia, left his practice for employment in Michigan, the Michigan court held that his giving up his practice and moving to Michigan was not an independent executed consideration so as to render his contract of indefinite duration an enforceable one. The Michigan court declared:

"The action of plaintiff in giving up the practice of his profession was but an incident necessary on his part to place himself in a position to accept and perform the contract and not a price of consideration paid to defendant for the contract of employment."

So, too, where a general manager or managing agent of a corporation gave up his job to accept a contract of life employment, the Maryland court in Chesapeake & Potomac Telephone Co. v. Murray, 198 Md. 526, 84 A.2d 870, 873 (1951), declared that:

"The mere *giving up of a job, business or profession* by one who decides to accept a contract for alleged life employment is but an incident necessary on his part to place himself in a position to accept and perform the contract, *and is not consideration for a contract of life employment.*" (Emphasis added.)

The foregoing language in the Murray case is quoted with approval in Winand v. Case, D.C.Md.1957, 154 F.Supp. 529, 541.

In McLaughlin v. Ford Motor Co., 6 Cir., 269 F.2d 120, 125, where plaintiff sought damages for an alleged breach of contract to give him a position in general management of Ford Motor Company, and plaintiff urged that he had a right of recovery because he gave up his employment with General Motors Corp., the court said:

"The action of the appellant in giving up his position with the General Motors Corp., was only a necessary incident in placing himself in a position so that he might perform his agreement with the Ford Motor Company. This conferred no benefit upon the Ford Motor Company and is not a *separate consideration* passing from the appellant to the Ford Motor Company within the meaning of the rule. * * *

" * * * In the absence of a *special consideration* passing from the appellant to the appellee, *other than the services to be performed* by the appellant, such contracts have been construed by the Supreme Court of Michigan as constituting an employment for an indefinite time terminable at the will of either party." (Emphasis added.)

See also the cases in Annot. 135 A.L.R., page 671. As being contrary to this rule plaintiff cites Stevens v. G. L. Rugo & Sons, Inc., 1 Cir., 209 F.2d 135, where plaintiff was a chief estimator of a firm of English architects, and where the Court indicated that plaintiff's moving to the United States from the West Indies was sufficient consideration to make defendant's promise enforceable; however, the majority holding on this point is incisively refuted by Judge Magruder's dissent where he distinguishes the cases upon which the majority rely. Judge Magruder is convincing in his conclusion that:

" * * * this necessary preliminary action by the plaintiff can hardly be regarded as the performance of an act which was bargained for as the agreed-upon exchange for a unilateral promise by Rugo to give permanent employment to the plaintiff at the plaintiff's option. See 1 Williston on Contracts § 112 (Rev. ed. 1936)." 209 F.2d at page 143.

Admittedly, there are cases to the contrary. See for example, Jones v. Carolina Power & Light Co., 206 N.C. 862, 175 S. E. 167 (1934), and the cases in Annot., 135 A.L.R. at page 669.

However, the arguments in support of the majority rule are more convincing to this Court. Although the West Virginia Court has not been squarely faced with the point, that Court has indicated its amenability to acceptance of the majority

rule in Wright v. Standard Ultramarine & Color Co., supra.

If it were true that the steps, which are the imperative adjuncts of employment, alone, could make binding unilateral contracts, then the defense of unenforceability would be eliminated in this phase of employment contracts. An employee who was formerly a loafer could assert that he gave consideration for his present employment when he surrendered his right not to work, or his right to work somewhere else. This argument would be just as specious as the assertion that continuing in one's employ—i. e., surrendering the right to quit—is consideration for that employment. So also with those who change jobs. It is inherent in the very idea of going to work for a new employer, that one must leave his present employer. And it was of the very essence of the plan to work in Man, West Virginia, that plaintiff would have to end his activities in New York. He could not practice medicine in both places at the same time. Defendant bargained for his services at Man, West Virginia. To say that defendant bargained for his moving from New York to Man, as a thing apart from the employment at Man, is too strained to be sensible.

There are many examples of the applicability of the concept of " * * * consideration other than the obligation of service to be performed * * *." Probably the most common of these is the release of personal injury claims against an employer in return for his promise of employment. See Rhoades v. Chesapeake & O. Ry. Co., 49 W.Va. 494, 39 S.E. 209, 55 L.R.A. 170 (1901). To attempt to extend this concept to encompass those activities which are part and parcel of the very act of becoming employed is to completely abrogate the legal significance of the concept. There would seem to be no good reason to distinguish the case of a professional man from that of a plumber or electrician who had built up a successful and profitable business or from an employee who had risen to a position of importance with his employer, and the cases seem to make no such distinction.

It is the holding of this Court that the contract under which plaintiff was employed by defendant was terminable at will, since it was not supported by any consideration from plaintiff other than the obligation of service to be performed.

Defendant's renewal motion for summary judgment is granted.